944 F.2d 101
 FEDERAL DEPOSIT INSURANCE CORPORATION, as receiver of
Guardian Bank, N.A., Plaintiff-Appellee,
v.
Louis B. BERNSTEIN; Susan L. Bernstein; Guardian
Diversified Services, Inc., a Delaware
Corporation, Defendants-Appellants.
 No. 1191, Docket 90-6315.
 United States Court of Appeals,
Second Circuit.
 Argued March 18, 1991.
Decided Sept. 11, 1991.
 
 Frank H. Wohl, New York City (Richard M. Strassberg, Lankler, Siffert & Wohl, of counsel), for defendants-appellants.
 Evan S. Widlitz, New York City (Louis Epstein, Charles M. Yoon, Reid & Priest, New York City, Ann S. DuRoss, Asst. Gen. Counsel, Joan E. Smiley, Sr. Counsel, Daniel H. Kurtenbach, Sr. Atty., Rae Schupack Nathan, Regional Counsel, Marguerite Sagatellian, Managing Atty., Marc E. Wieman, Sr. Atty., F.D.I.C., Washington, D.C., of counsel), for plaintiff-appellee.
 Before MESKILL, MINER and ALTIMARI, Circuit Judges.
 MINER, Circuit Judge:
 
 
 1
 Defendants-appellants Guardian Diversified Services, Inc. ("GDSI") and Louis B. Bernstein and Susan L. Bernstein, his wife, ("the Bernsteins") appeal from a partial summary judgment in the amount of $175 million plus interest entered in the United States District Court for the Eastern District of New York (Mishler, J.) against GDSI and the Bernsteins and in favor of plaintiff-appellee Federal Deposit Insurance Corporation ("FDIC") as Receiver of Guardian Bank, N.A. The judgment represents the amount due on a loan made by Guardian Bank to GDSI. The loan is documented by a loan agreement and note executed by GDSI and is guaranteed by the Bernsteins, who executed a Guaranty and Suretyship Agreement with the Bank to guarantee payment.
 
 
 2
 In the district court, GDSI and the Bernsteins contended that the FDIC procured the default of the note and loan agreement by inducing the termination of a mortgage servicing contract between a subsidiary of GDSI and the Government National Mortgage Association ("GNMA"). The Bernsteins also contended that their guaranty, having been given as part of a divestiture transaction the FDIC claims is void, is unenforceable for failure of consideration. The district court found that these contentions raised no issues as to any material fact and concluded that the FDIC was entitled to judgment as a matter of law on both the loan and the guaranty as successor to the rights of the Guardian Bank.
 
 
 3
 On appeal, GDSI and Bernstein advance the same arguments they put forward in the district court. In addition, they claim that this court lacks appellate jurisdiction because the district court improperly granted certification for partial summary judgment pursuant to Fed.R.Civ.P. 54(b). We affirm the judgment of the district court in all respects.
 
 BACKGROUND
 I. Of the Loan and Guaranty
 
 4
 The loan and the guaranty were parts of a complex set of simultaneous transactions through which the Guardian Bank divested itself of the ownership of GDSI and GDSI's subsidiary, New York Guardian Mortgage Corp. ("NYGMC"). Engaged in the mortgage servicing business, NYGMC derived most of its revenues from issuing mortgage-backed securities and servicing the mortgages underlying those securities pursuant to agreements with GNMA. Divestiture was accomplished when LBB Company, Inc. ("LBB"), a holding company owned by Louis B. Bernstein, purchased from the Guardian Bank 100% of the stock of GDSI and thereby acquired NYGMC as well. The purchase price was the sum of $1 million and a personal guaranty from the Bernsteins of the $175 million loan made by the Bank to GDSI to facilitate the divestiture. During the course of all these transactions, which occurred on March 30-31, 1987, the principal shareholder of the Guardian Bank was Louis B. Bernstein.
 
 
 5
 Two cease and desist orders issued by the Office of the Controller of the Currency ("OCC") provided the impetus for the divestiture. In September of 1984, OCC determined that the Guardian Bank was inadequately capitalized and that its earnings and overall condition had declined to an unsafe level. According to the OCC, these conditions were brought about by the Bank's use of federally-insured deposits to fund the rapid growth of the mortgage-servicing business conducted by its immediate subsidiary, NYGMC. Consequently, on November 16, 1984, the Bank stipulated to the first cease and desist order, which required a plan to limit growth and to maintain a minimum capitalization ratio of 7%. Continuing losses from NYGMC's mortgage servicing business culminated in a second OCC cease and desist order on July 29, 1986. That order required the Bank to submit to the OCC for review and approval a plan for the divestiture of NYGMC in the event that the Bank's pending plan for divestiture was withdrawn or disapproved. A planned merger never occurred, and it appears that the terms of the March, 1987 divestiture, in which LBB acquired GDSI after the Bank restructured its subsidiaries to make GDSI the parent of NYGMC, never were submitted to the OCC for review.
 
 
 6
 NYGMC had become a wholly-owned subsidiary of the Guardian Bank in 1979 when Louis Bernstein assigned to it, in return for approximately 75% of the Bank's stock, the shares of a holding company which then owned NYGMC. As of June 21, 1989, NYGMC was one of the largest mortgage servicing companies in the nation, with approximately 350 employees engaged in servicing more than 168,000 mortgages having a principal balance of $8.3 billion. Approximately 80% of NYGMC's business consisted of its activities as an issuer of mortgaged-backed securities and as the servicer of the mortgages underlying those securities under the GNMA Pass-Through Program. The structure of the Program was as follows: Individual home mortgages were assembled into "pools," which were sold to brokerage houses in the form of securities. These securities were divided into small denominations and re-sold to individual and institutional investors. The monthly payments of principal and interest made by the individual mortgagors were collected by NYGMC and remitted to the holders of the securities. Timely payment to each security holder was guaranteed by GNMA.
 
 
 7
 When GMNA terminated the authority of NYGMC to act as an issuer or servicer under the Pass-Through Program on June 21, 1989, NYGMC was servicing some 3,500 pools containing 140,000 mortgages. Approximately 70% of the mortgages in the pools were insured by the Federal Housing Administration ("FHA"). The remainder were guaranteed by the Veterans Administration ("VA"). For each pool of mortgages established under the GNMA Pass-Through Program, NYGMC entered into a "Guaranty Agreement" ("Agreement") with GNMA. The Agreements recited that NYGMC was an approved issuer; described NYGMC's responsibility for administering the securities, servicing the pooled mortgages and making full and timely payments to security holders; and provided for the GNMA guaranty, supported by the full faith and credit of the United States. Each Agreement reserved to GNMA the right to terminate NYGMC's servicing function and to take ownership of the mortgage pool upon the occurrence of an event of default, subject to the unsatisfied rights of the security holders. It was the declaration of an event of default by GNMA and the consequent termination of NYGMC as an issuer and servicer that resulted in the loss of revenues to NYGMC and made it impossible for GDSI, the parent of NYGMC, to repay the loan to Guardian Bank.
 
 II. Of the FDIC Takeover
 
 8
 The FDIC takeover of the Guardian Bank was precipitated by financial problems that included the inability of GDSI to repay the $175 million loan, rendering the Bank insolvent. GDSI's inability to pay was precipitated by the termination of its subsidiary, NYGMC, as a participant in the GNMA mortgage backed securities Pass-Through Program. We therefore examine the "event of default" that impelled GNMA to terminate NYGMC as a participant in its Program. According to GNMA's letter to NYGMC dated June 21, 1989, which "declare[d] an event of default":GNMA has been advised that NYGMC did not remit in a timely manner all payments due to holders of some mortgage-backed securities issued and outstanding under the Guaranty and Contractual Agreements. The failure to remit such payment constitutes a breach of Section 4.01 of those Guaranty Agreements and Sections 15-2a and 15-2c of the GNMA II Mortgage-Backed Securities Guide. (GNMA 5500.2, the Guide).
 
 
 9
 The letter of June 21, 1989 was the result of a review of the activities of NYGMC conducted by the accounting firm of Coopers and Lybrand ("C & L") at the request of GNMA. C & L reported that it was the practice of NYGMC not to pass through to security holders payments made to it by the FHA and the VA on defaulted mortgages issued or guaranteed by those agencies. C & L also reported that the amounts of partial claims payments due securities holders were reduced by the amounts of any delinquent principal and interest due on the mortgages. Also noted was NYGMC's practice of charging a monthly service fee on the total amount of the partial claims payments. GNMA concluded that the failure to pass through to securities holders the total amount of partial claims payments was violative of its regulations and of the Agreements executed by NYGMC; that its regulations also were violated by NYGMC's use of partial claims payments to reimburse advances previously made to cover delinquent mortgage payments; and that NYGMC's charges of service fees on the total monthly payments, rather than only on the interest portion, was improper. Information provided by C & L indicated that NYGMC failed to pass through to securities holders in a timely manner approximately $30 million in partial FHA and VA claims payments. Although GNMA found that the full amounts received ultimately were passed through to the securities holders, it also found that NYGMC was benefitting substantially from the improper retention.
 
 
 10
 On June 21, 1989, the OCC determined that the Guardian Bank was insolvent, ordered the Bank closed, took possession of its assets and affairs, and appointed FDIC as Receiver. Among the assets held by the FDIC as Receiver are its claims against GDSI and the Bernsteins. Until its takeover by FDIC, Guardian Bank was a national bank, organized and operating under the laws of the United States. According to an affidavit of Ronald G. Conroy, a National Bank Examiner and employee of OCC, the Bank's continued investment in mortgage servicing after the "sham divestiture" of GDSI and NYGMC to LBB was the major cause of its financial problems. Through the purchase of mortgage servicing rights after the divestiture, the aggregate balance of mortgages serviced by NYGMC increased substantially. In his affidavit, Mr. Conroy noted "that the Bank's investment in mortgage servicing related assets which, according to defendants, will be frozen at approximately $175 million at the date of the Sham Divestiture, had increased as of December 31, 1988 to an amount in excess of $316 million."
 
 
 11
 Also of concern to the OCC and impelling the takeover of the Bank was the lack of compliance with a 1988 OCC order requiring the Bank and Louis Bernstein immediately to "divest themselves of NYGMC and their mortgage servicing portfolios ... through an arm's length transaction." The order provided that the net proceeds of the sale were to be applied in satisfaction of the amount owed by NYGMC to the Bank. As of October 31, 1988, according to the Conroy affidavit, the Bank had provided NYGMC with more than $43 million in advances to cover various shortfalls relating to serviced mortgages, but Bernstein had failed to provide sufficient information to allow an assessment of the status of the advances or to verify the need therefor. Apparently, OCC discovered early in 1989 that NYGMC had delayed foreclosing mortgages and recognizing millions of dollars in mortgage servicing losses. An ongoing problem for the OCC was its inability to secure necessary information from the Bank and the Bernsteins. The Bernsteins, as guarantors of the GDSI loan, failed to provide the Bank or the OCC with required personal financial statements despite repeated requests. Mr. Conroy said that, "since the Sham Divestiture, Bernstein has not given any account to the Bank of his use of NYGMC funds for his personal expenses." Moreover, it appears that Bank reports required by federal regulations, particularly reports relating to NYGMC, have been late as well as unreliable. It seems reasonable to conclude that essential information intentionally was withheld from the OCC by the Bank and its controlling stockholder.
 
 III. Of the District Court Proceedings
 
 12
 On June 22, 1989, immediately following the takeover of the Bank, the FDIC commenced an action against the Bernsteins, the former directors and officers of the Bank, and various affiliated corporations. In its complaint, the FDIC pleaded thirteen separate claims, including breach of fiduciary duty, negligence, waste and violation of federal statutes and regulations governing national banks. In the twelfth cause of action, the FDIC sought to recover on the $175 million defaulted loan, alleging that "all of the indebtedness under the GDSI Loan Agreement is immediately due and payable." The FDIC's claim on the loan guaranty executed by the Bernsteins is pleaded in the thirteenth cause of action, in which it is asserted that the Bernsteins "are liable to the Bank for all indebtedness and liabilities of GDSI to the Bank." The motion for summary judgment on the twelfth and thirteenth causes of action was filed on August 15, 1989.
 
 
 13
 The Bernsteins filed papers in opposition to the partial summary judgment motion as well as a cross motion for a stay of the action pending the outcome of a grand jury investigation in which Mr. Bernstein was a target. The district court heard oral argument on June 29, 1990. Thereafter, the court notified the parties that it would "turn to the basis for GNMA to terminate NYGMC's right as an issuer or find that there is no basis." Accordingly, the court directed further submissions and received from the FDIC a C & L report analyzing the handling of partial claims settlements by NYGMC and received on behalf of the Bernsteins affidavits from NYGMC Vice President Joanne Halley, Mr. Bernstein, and an expert in GNMA mortgage servicing.
 
 
 14
 The Memorandum of Decision and Order directing entry of the partial summary judgment sought by the FDIC and denying the stay sought by the Bernsteins was filed on November 2, 1990. Finding no just reason for delay, the district court directed that judgment be entered under the provisions of Fed.R.Civ.P. 54(b). The court noted and rejected the contentions of the Bernsteins that genuine issues of material fact were presented as to: the validity of the loan agreement and the failure of consideration for the guaranty, in view of the FDIC's claim of sham divestiture; estoppel, waiver, ratification and unclean hands, arising from the FDIC's inconsistent positions regarding divestiture; wrongful termination of NYGMC by GNMA as the cause of default of the GDSI loan; and participation by the FDIC in procuring the wrongful termination.
 
 
 15
 In finding that no triable issues had been raised, the district court determined that a claim for wrongful termination of NYGMC's authority by GNMA could not be asserted against the FDIC as Receiver of the Bank. The court determined further that NYGMC failed to pass through significant amounts of FHA and VA payments and that the right of GNMA to terminate NYGMC's authority under the terms of the Agreement was clear in any event. With respect to the affirmative defenses raised by the Bernsteins individually, the court found those defenses precluded by federal common law and by statute. As to the defenses of estoppel, waiver, ratification and unclean hands arising from the inconsistent positions pleaded by the FDIC (prosecuting a claim to establish the validity of the Bernsteins' guaranty and claiming the invalidity of the transfer of GDSI to LBB), the court made two observations: First, that the claim against the Bernsteins pleaded in the thirteenth cause of action is distinct from the claims asserted against them and the other directors in the other causes of action; and second, that the pleading of alternative theories is permissible and the possibility of a double recovery is easily prevented here.
 
 DISCUSSION
 
 16
 Summary judgment must "be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden is on the party moving for summary judgment to establish the absence of any genuine issues of material fact, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986), and any ambiguities must be resolved in favor of the non-movant, see Celotex Corp. v. Catrett, 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 2556 n. 2, 91 L.Ed.2d 265 (1986). The motion should be granted if "reasonable minds could not differ as to the import of the evidence before the court." Cable Science Corp. v. Rochdale Village, Inc., 920 F.2d 147, 151 (2d Cir.1990). We agree with the district court that there are no ambiguities to be resolved, that reasonable minds cannot differ as to the evidence and that the plaintiff carried its burden by demonstrating the lack of any genuine factual issues in the record before the court.
 
 
 17
 The contention of GDSI and the Bernsteins that the FDIC procured the default of the loan agreement between the Bank and GDSI by inducing the termination of NYGMC, GDSI's subsidiary, under the GNMA Pass-Through Program, cannot be sustained under any view of the evidence. This is so because the wrongful conduct attributed to the FDIC as corporation cannot be attributed to the FDIC as receiver. Created by Congress to "promot[e] the stability of and confidence in the nation's banking system," Gunter v. Hutcheson, 674 F.2d 862, 870 (11th Cir.), cert. denied, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982), the FDIC is authorized by statute to function in two separate and distinct capacities: "the Corporation shall insure the deposits of all insured banks as provided in this chapter," 12 U.S.C. § 1821(a)(1) (1988); "the Corporation as receiver of a closed national bank ... shall have the right to appoint an agent or agents to assist it in its duties as such receiver," 12 U.S.C. § 1822(a) (1988). Because they are discrete legal entities, "Corporate FDIC is not liable for wrongdoings by Receiver FDIC." FDIC v. Roldan Fonseca, 795 F.2d 1102, 1109 (1st Cir.1986). Here, the FDIC did not even become receiver of the bank until after it had allegedly colluded in its corporate capacity with GNMA to terminate NYGMC as an approved issuer and servicer of mortgage-backed securities. Since it sues in this case in the capacity of receiver, it cannot be charged with corporate wrongdoings occurring before the action was commenced.
 
 
 18
 The contention that the FDIC somehow procured the default of the GDSI loan agreement and thereby triggered the liability of the Bernsteins on their guarantee of the loan by participating in GNMA's termination of NYGMC is without substance in any event. First, as found by the district court, there is no evidence that the FDIC participated in the decision to terminate NYGMC's authority. That OCC and FDIC may have cooperated with GNMA prior to the termination does not permit an "inference that ... the FDIC participated with GNMA in the decision to terminate NYGMC's servicing rights," as appellants contend. Cooperation was desirable and proper under the circumstances, and there simply is no proof that it masked any untoward activity. Second, the fact is that the FDIC had no control over the actions of GNMA and no legal right to direct or participate in the termination of NYGMC. The power to declare a default by the issuer of mortgage-backed securities and to take up the pool of mortgages against which the securities are issued is confided to the sole discretion of GNMA. See 12 U.S.C. § 1721(g) (1988).
 
 
 19
 We agree, moreover, with the district court's finding that "GNMA's right to terminate NYGMC's authority under the Guaranty Agreement is clear." That authority was conferred by the Agreements NYGMC executed and by the regulations governing the Agreements referred to in the letter of termination. GNMA's Mortgage Backed Securities Guide allows for the disposition of partial claims settlements received from the FHA or VA in only two ways:
 
 
 20
 [t]he entire amount of the claim settlement is applied directly against the unpaid principal balance of the loan as an additional principal payment and passed through to securities holders as an unscheduled recovery of principal[;]
 
 
 21
 or
 
 
 22
 [t]he issuer uses the funds received in the partial claim settlement together with sufficient corporate funds to completely liquidate the loan from the pool by paying securities holders the full unpaid principal balance of the loan.
 
 
 23
 Mortgage Backed Securities Guide, app. 11, pp 1(a) & (b). NYGMC did not apply the payments it received in accordance with either of the foregoing alternatives. It appears from the C & L report that NYGMC failed to pass through to investors an average of $2 million dollars per month, during the period April 20, 1988 through May 31, 1989, in insurance proceeds it received on defaulted mortgages insured by the VA and FHA.
 
 
 24
 For a substantial period of time, NYGMC disposed of the FHA and VA claims settlements by first deducting its servicing fee, then reimbursing itself for pool advances and, lastly, paying the balance of the settlement to securities holders as unscheduled recoveries of principal. NYGMC characterizes as an "arcane issue" the manner of NYGMC's application of the partial claims payments made on defaulted or foreclosed mortgages. NYGMC contends that it continued to advance funds to security holders after the defaults despite the fact that it did not receive payment from the mortgagors. After the foreclosures, NYGMC alleges that it would make claims on the FHA and VA mortgage guaranties and receive partial claims settlements and, either immediately or later, final claims settlements. NYGMC asserts that GNMA improperly objected to its practice of waiting until the final settlements before fully liquidating the defaulted loans. It argues that the amounts involved were "insignificant" and the delay in payments "reasonable." The manner of the application of funds is hardly an arcane question; the amounts improperly applied were not insignificant; and the delay cannot be said to be reasonable under the circumstances. NYGMC simply did not comply with the obligations to which it was subject in regard to the claim settlements received: either pass through the entire amount of the settlement or add to a partial settlement sufficient funds to liquidate the loan from the pool.
 
 
 25
 NYGMC argues that, "even if [its] procedures constituted something less than perfect compliance, they did not constitute such a material defect as to warrant the drastic action of termination without notice." NYGMC argues that security holders always were paid "upon receipt of the final claim settlement, which came either at the same time as the partial settlement or 1-4 months later;" that the "procedure benefitted the security holders by maximizing their interest earnings;" and that "[a]t most, NYGMC got about 2% of its fees a few months earlier than it otherwise would have received them." These arguments are not persuasive. The prompt and regular payment of the allocated shares of mortgage interest and principal in accordance with the rules established therefor accounts for the marketability of GNMA guaranteed mortgage backed securities and the confidence of the security holders. NYGMC benefitted substantially by not making the pass-through payments as required: by using funds rightfully belonging to the security holders to reimburse itself for advances it was required to make on delinquent loans in its mortgage-servicing portfolio, it was able to avoid using corporate funds of its own. GNMA was fully justified in terminating NYGMC for its conduct. Because GNMA had the right to terminate, FDIC cannot be guilty of colluding with it to effect an improper termination.
 
 
 26
 The Bernsteins claim that, if as alleged in the complaint, the Bank's divestiture of GDSI (and NYGMC) to LBB was a sham, then there was no consideration for their guaranty of the loan to GDSI and that they should not be liable on it. They thus attempt to take advantage of a fraud they are alleged to have perpetrated by using it to deny their liability on a loan concededly guaranteed by them. Of course, they maintain that the divestiture was a valid transaction and raise the defense of lack of consideration only to have it available in case the transaction ultimately is shown to have been indeed a sham. The FDIC has pleaded the fraudulent scheme in the alternative, as it is entitled to do, only in support of its claim to the relief of rescission. See Fed.R.Civ.P. 8(e).
 
 
 27
 In any event, under extensions of the rule established in D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), failure of consideration for the guaranty is not a defense available to the Bernsteins. In D'Oench, the Supreme Court held that a defense revolving around a secret undertaking between a bank and the maker of a note, that the note would not be enforced, was not available against the FDIC, which had become the holder of the note. Id. at 460, 62 S.Ct. at 680. The Court found that it was "federal policy to protect [the FDIC] and the public funds which it administers against misrepresentations as to the securities or other assets in the portfolios of the banks which [the FDIC] insures...." Id. at 457, 62 S.Ct. at 679. The D'Oench doctrine has been codified:
 
 
 28
 No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it ... either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [FDIC] unless such agreement ... is in writing.
 
 
 29
 12 U.S.C. § 1823(e)(1) (1988).
 
 
 30
 The D'Oench doctrine has been extended through the development of federal common law to apply to situations other than those involving secret agreements. See Vernon v. Resolution Trust Corp., 907 F.2d 1101, 1106 (11th Cir.1990). It has been applied to bar the defense of failure of consideration where the FDIC had no knowledge of such a claim and acted in good faith in acquiring assets. See FDIC v. Leach, 772 F.2d 1262, 1267 (6th Cir.1985). Personal guaranties have been among the assets affected by the doctrine. See Twin Constr., Inc. v. Boca Raton, Inc., 925 F.2d 378, 382 (11th Cir.1991). Section 1823(e) itself has been interpreted to prohibit the assertion against the FDIC of bank misrepresentations inducing the execution of a note and guaranty. See Langley v. FDIC, 484 U.S. 86, 91-93, 108 S.Ct. 396, 401-02, 98 L.Ed.2d 340 (1987). Here, there is no indication that the FDIC had any suspicion of a sham transaction giving rise to a claim of lack of consideration when it took over its duties as receiver of the bank upon appointment of the OCC. The OCC may very well have had the necessary knowledge, but that is not relevant here. The Bernsteins, as guarantors of a loan arising from a sham transaction, if that it was, "lent [themselves] to a scheme or arrangement whereby the [FDIC] ... was likely to be misled," D'Oench, 315 U.S. at 460, 62 S.Ct. at 681, and that scheme or arrangement, viz, the divestiture transaction and its sham character, cannot be used as a defense against the FDIC.
 
 
 31
 Finally, we reject the claim of GDSI and the Bernsteins that Rule 54(b) certification was granted improvidently in this case. The timing of the entry of final judgment under the Rule is committed to the sound discretion of the district court. See Sears, Roebuck & Co. v. Mackey, 351 U.S. 427, 437, 76 S.Ct. 895, 900, 100 L.Ed. 1297 (1956). Only an abuse of discretion will justify disturbing the court's decision regarding certification. See Curtiss-Wright Corp. v. General Elec. Co., 446 U.S. 1, 10, 100 S.Ct. 1460, 1466, 64 L.Ed.2d 1 (1980). The factors to be considered "are the relatedness of the pending and adjudicated claims, the factual bases for the claims and the effect a decision on the pending claims would have on questions raised on appeal." See Shrader v. Granninger, 870 F.2d 874, 878 (2d Cir.1989). The district court here found that "[t]he claims on which judgment is entered [are] separate and distinct as to operative facts and theories of liability from the remaining claims."
 
 
 32
 The twelfth cause of action was one to recover from GDSI in the amount of the indebtedness plus interest. The thirteenth cause of action was one to recover from the Bernsteins in the same amount on their guaranty. The claims against the Bernsteins were different from those asserted against the other directors and against them in the other causes of action. The twelfth and thirteenth causes, despite some factual overlap with the other causes, involve at least some different questions of law and fact and are aimed at relief different from the relief sought in the other claims pleaded by FDIC. See Cullen v. Margiotta, 811 F.2d 698, 711 (2d Cir.), cert. denied, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987). We see no basis for finding any abuse of discretion by the district court in regard to the Rule 54(b) certification.
 
 
 33
 We have considered the remaining arguments advanced by appellants and find them to be without merit.
 
 CONCLUSION
 
 34
 The judgment of the district court is affirmed in all respects.