80 F.3d 681
 44 Fed. R. Evid. Serv. 210
 FEDERAL DEPOSIT INSURANCE CORPORATION, as the Receiver of
Connecticut Savings Bank, Plaintiff-Appellee,
v.
SUNA ASSOCIATES, INC., Joseph E. Celentano and Kalman A.
Sachs, Defendants-Appellants,
Mill River Condominium Association, Inc., Defendant.
 No. 336, Docket 95-6022.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 23, 1995.
Decided March 26, 1996.
 
 Appeal from a deficiency judgment entered against Appellants by the United States District Court for the District of Connecticut (Eagan, M.J.), on the grounds that the district court erred in finding that Appellants were barred from presenting evidence as to their understanding of the "base rate" term in the note, finding that the guarantors of the note were not discharged as a result of alteration in the method of calculating the base rate, relying on the valuation testimony of Appellee's appraisal witness, and considering the testimony of Appellee's rebuttal witness to establish value.
 Bernard Green, Green and Gross, P.C., Bridgeport, CT, for Defendant-Appellant Suna Associates, Inc.
 Jeffrey M. Sachs, Gesmonde, Pietrosimone, Sgrignari, Pinkus & Sachs, Hamden, CT, (John M. Gesmonde, of counsel), for Defendant-Appellant Kalman A. Sachs.
 E. Whitney Drake, Washington, D.C., (Richard J. Buturla, Berchem, Moses & Devlin, Milford, CT; Ann S. DuRoss, Asst. General Counsel, Richard J. Osterman, Jr., Senior Counsel, FDIC, Washington, D.C., of counsel), for Plaintiff-Appellee.
 Before: FEINBERG, WALKER, and CALABRESI, Circuit Judges.
 WALKER, Circuit Judge:
 
 
 1
 This is an appeal from a deficiency judgment entered against a mortgagor corporation and its principal and against a guarantor of the accompanying note by the United States District Court for the District of Connecticut (F. Owen Eagan, Magistrate Judge ). Appellants together allege four errors by the district court: (1) its finding that the D'Oench, Duhme doctrine (derived from D'Oench, Duhme & Co., Inc. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942)) and 12 U.S.C. § 1823 barred Appellants' presentation of evidence as to their understanding of the "base rate" term in the note; (2) its finding that the guarantors of the note were not discharged as a result of an alteration in the method of calculating the base rate; (3) its reliance on the allegedly unreliable valuation testimony of Appellee's appraisal witness; and (4) its consideration of the testimony of Appellee's rebuttal witness to establish value, a purpose said to be beyond the limited scope for which the testimony was admitted.
 
 
 2
 For the reasons that follow, we affirm the judgment of the district court.
 
 BACKGROUND
 
 3
 On December 19, 1986, Appellant Suna Associates, Inc. ("Suna"), a Connecticut corporation, executed a mortgage note payable to the order of Connecticut Savings Bank ("Bank") in the amount of $2,378,000. The terms of the note provided that the interest rate would be "one (1.00%) percent per annum floating above Bank's base rate as same may change from time to time." The Bank's base rate of interest for loans was determined by the Bank's Asset and Liability Management Committee. The evidence presented to the district court indicates that for a period of time prior to 1990, the Bank's base rate mirrored the New York prime rate, but that in setting its base rate, the Bank considered a variety of factors in addition to the New York prime rate, including but not limited to the size and strength of the Bank's portfolio, the relative amounts of commercial and residential real estate loans, and local as well as external market conditions. The note was devoid of any language expressly linking the base rate to the New York prime rate.
 
 
 4
 The note was secured by a mortgage covering forty-five condominium units known as the "Mill River Condominiums," located in a converted factory building in New Haven, Connecticut. The note was also secured by the individual guaranties of Joseph E. Celentano and Kalman A. Sachs in favor of the Bank.[1] Celentano was a principal of Suna. Sachs was a sophisticated developer and a major customer of the Bank, as well as one of the attorneys who had represented the Bank. Under the terms of the Sachs guaranty, the Bank was empowered to "modify or otherwise change any terms of all or any part of the Indebtedness or the rate of interest thereon," "without notice to [Sachs] and without affecting in any way its rights." The guaranty subjected Sachs to a maximum of $1,289,000 liability for any deficiency.
 
 
 5
 The note was not paid at maturity. The only principal payments by Suna totaled $320,000 and were made between December 1988 and September 1989. Interest payments were made through April 1991. In May 1990, the Bank entered into a Memorandum of Understanding with the Federal Deposit Insurance Corporation ("FDIC"), which required the Bank to improve its capital position and earnings. In order to do so, the Bank decided not to lower its base rate when the New York banks reduced their prime rate.
 
 
 6
 No payments were made on the note after May 1, 1991. On July 26, 1991, the Bank declared the remaining principal and interest due and payable. Thereafter, Suna made no further payments but instead, on July 31, 1991, made a purported tender of the thirty-five remaining unsold condominium units to the Bank. By letter dated August 2, 1991, the tender was made subject to the rights of existing tenants. On August 10, 1991, the Bank commenced a foreclosure action in the Connecticut Superior Court.
 
 
 7
 The Bank's financial condition continued to deteriorate and, on November 14, 1991, the Commissioner of Banking for the State of Connecticut declared the Bank insolvent. The FDIC was appointed receiver. On December 13, 1991, the FDIC removed the case to the district court pursuant to 12 U.S.C. § 1819(b)(2)(A). On March 4, 1992, Suna and Sachs filed a Motion for Judgment of Strict Foreclosure, denying the exact amount claimed to be owed on the note but admitting all other material allegations of the complaint. The motion was granted on April 20, 1992. Pursuant to the Judgment for Strict Foreclosure, title to the thirty-five condominium units passed to the FDIC on May 7, 1992, thereby fixing that date as the date for the appraisals that would be used in the subsequent deficiency determination. See Eichman v. J & J Bldg. Co., 216 Conn. 443, 449, 582 A.2d 182, 185 (1990).
 
 
 8
 The parties consented to a full trial before a magistrate judge pursuant to 28 U.S.C. § 636(c). On January 13, 1994, Magistrate Judge Eagan issued an Amended Recommended Ruling on Motion for Deficiency Judgment, granting a deficiency judgment against Appellants. The district court valued the condominium units at $870,000 and determined the total deficiency for which Suna was liable to be $1,696,244.93. The district court further determined that Sachs was liable for $1,289,000 of the total deficiency. This appeal is from a final order disposing of all claims with respect to all parties in this case.[2]
 
 DISCUSSION
 I. D'Oench, Duhme and 12 U.S.C. § 1823
 
 9
 The first question for resolution is whether Suna and Sachs were barred by the D'Oench, Duhme doctrine and by 12 U.S.C. § 1823 from offering evidence of oral communications between the Bank and Appellants to the effect that there was an understanding that the Bank's base rate would at all times adhere to the New York prime rate and that the Bank therefore impermissibly changed the base rate on the note. The district court found that they were. In so finding, Magistrate Eagan stated: "On its face, the note left the Bank with discretion to unilaterally change its base rate. Any agreement to the contrary which is not found on the face of the document cannot be enforced pursuant to either D'Oench or U.S.C. § 1823(e)."
 
 
 10
 The D'Oench, Duhme doctrine has its origins in a 1942 Supreme Court case, D'Oench, Duhme & Co., Inc. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). In D'Oench, Duhme, the FDIC sued to enforce a promissory note that it had acquired from a failed bank. As a defense, the maker of the note alleged that the note was given without consideration and with the understanding that the note would never be called for payment. Relying on the federal policy of protecting federal corporations "from misrepresentations made to induce or influence the action of [the FDIC], including misstatements as to the genuineness or integrity of securities in the portfolios of banks which it insures or to which it makes loans," the Supreme Court rejected this defense. Id. at 459, 62 S.Ct. at 680. The Court acknowledged that "one who gives such a note to a bank with a secret agreement that it will not be enforced must be presumed to know that it will conceal the truth from the vigilant eyes of the bank examiners." Id. at 460, 62 S.Ct. at 680-81.
 
 
 11
 Since its origin, the D'Oench, Duhme doctrine "has been extended through the development of federal common law to apply to situations other than those involving secret agreements." FDIC v. Bernstein, 944 F.2d 101, 108 (2d Cir.1991). See also Twin Constr., Inc. v. Boca Raton, Inc., 925 F.2d 378, 382 (11th Cir.1991); FDIC v. McCullough, 911 F.2d 593, 599-600 (11th Cir.1990), cert. denied, 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991). The McCullough Court noted that "[w]hether a borrower's defense is barred by the D'Oench doctrine depends upon whether the purported agreement relied upon by the private party was ever memorialized in writing or otherwise made explicit such that ... the FDIC would have knowledge of the bank's obligations during an evaluation of the bank's records." Id. at 600 (footnote omitted).
 
 
 12
 Borrower defenses premised upon other purported, unwritten statements leading to claims of fraudulent inducement or failure of consideration are now also generally precluded by D'Oench and its progeny.... The evil to be prevented in any of these situations is precisely the same: the private party seeks to rely upon unrecorded promises or schemes that purport to impose obligations other than those appearing in the bank's records upon the financial institution.
 
 
 13
 Id. Cf. Inn at Saratoga Assocs. v. FDIC, 60 F.3d 78, 82 (2d Cir.1995) ("[T]he D'Oench, Duhme doctrine 'favors the interests of depositors and creditors of a failed bank, who cannot protect themselves ... over the interests of borrowers, who can.' ") (quoting In re Century Centre Partners Ltd., 969 F.2d 835, 839 (9th Cir.1992), cert. denied, 509 U.S. 905, 113 S.Ct. 2997, 125 L.Ed.2d 690 (1993)). Among the assets affected by the D'Oench, Duhme doctrine are personal guaranties. Bernstein, 944 F.2d at 108 (citing Twin Constr. Inc. v. Boca Raton, Inc., 925 F.2d 378, 382 (11th Cir.1991)). See also Maniar v. Capital Bank of California, No. C-89-2774 MHP, 1993 WL 515880 (N.D.Cal. Dec.6, 1993).
 
 
 14
 The D'Oench, Duhme doctrine has been codified at 12 U.S.C. § 1823(e)(1), which provides as follows:
 
 
 15
 No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it ... either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [FDIC] unless such agreement (A) is in writing, (B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution, (C) was approved by the board of directors of the depository institution or its loan committee ..., and (D) has been, continuously, from the time of its execution, an official record of the depository institution.
 
 
 16
 In essence, this statute prevents parol evidence from altering the rights and obligations of the parties to any notes or other documents of insured institutions that pertain to assets acquired by the FDIC.
 
 
 17
 The issue in this case is whether the evidence said to affect the base rate provision in the note that Appellants unsuccessfully sought to introduce at trial is properly characterized as that which is necessary to clarify an ambiguous contract term or, rather, as evidence of an unwritten agreement that in setting the base rate, the Bank would adhere to the prime rate for New York banks. Appellants urge upon us the former characterization while the FDIC argues in favor of the latter. In our view, the express language of the note, together with the relevant case law, compels the conclusion that the D'Oench, Duhme doctrine and 12 U.S.C. § 1823(e) bar parol evidence that would vary the terms of the note.
 
 
 18
 While it is a venerable and widely accepted principle of contract interpretation that an ambiguity in a note should be construed against the party that drafted it--in this case, the Bank--the language here is not ambiguous. The note's provision for the calculation of interest at "a rate one ... percent per annum floating above Bank's base rate as same may change from time to time" placed the borrower on notice that the base rate could change and in no way restricted the method of calculation of the base rate. Prior to signing the note, the borrower was free to bargain for language that would have limited changes in the base rate according to calculation by a particular method.
 
 
 19
 We reject Suna's claim that the Bank's alteration in the method by which it calculated the base rate was a "deceitful omission" in the terms of the note and thus beyond the reach of the D'Oench, Duhme doctrine and 12 U.S.C. § 1823(e). We also reject Sachs's claim that alleged admissions of the Bank's officers that "base rate" means "New York prime rate" takes this case outside the scope of the D'Oench, Duhme doctrine and 12 U.S.C. § 1823(e). In addition, we decline to find that Appellants fit within the innocent borrower defense articulated by the Ninth Circuit in FDIC v. Meo, 505 F.2d 790 (9th Cir.1974), to the extent that the defense is still viable following Langley v. FDIC, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987). See Inn at Saratoga, 60 F.3d at 83 (questioning the viability of the Meo "innocent borrower" defense and collecting cases). In Meo, the Ninth Circuit refused to grant the FDIC protection under the D'Oench, Duhme doctrine from defenses raised by an innocent borrower. The Meo Court found that "appellant was a completely innocent party with respect to the bank's improper execution of [a] stock sale agreement" and held that "a bank borrower who was neither a party to any deceptive scheme involving, nor negligent with respect to, circumstances giving rise to the claimed defense to his note is not estopped from asserting such defense against the bank's receiver." Id. at 792, 793 (footnote omitted). Neither Suna nor Sachs is the equivalent of Mr. Meo. By executing a note that Suna now asserts did not contain the full agreement of the parties, Suna--a sophisticated corporation--was arguably negligent and certainly not innocent. Magistrate Eagan did not abuse his discretion in deciding against Suna based on the language of the note. Had he admitted into evidence a separate "agreement" (informal or formal) between the Bank and Appellants to tie the base rate to the New York prime rate, Magistrate Eagan would have contravened D'Oench, Duhme. In this case, the D'Oench, Duhme doctrine and 12 U.S.C. § 1823 barred Appellants from presenting evidence as to any defense based upon an alleged agreement that the base rate would be tied inexorably to the prime rate in New York because the language of both the note and the accompanying guaranty was unambiguous. The alleged missing term here is precisely the type of "outside agreement" evidence D'Oench, Duhme and 12 U.S.C. § 1823(e) intended to exclude.
 
 
 20
 A separate argument by Sachs that the Bank "altered" the note and accompanying guaranty by changing its method of calculating the base rate, thereby discharging his liability, borders on the frivolous. The short response to this argument is that although the method of calculating the base rate was altered, the note itself was not. The note was not physically distorted or destroyed; nor was its language changed. In addition, contrary to Sachs's assertion, there is no evidence of bad faith on the part of the Bank.
 
 
 21
 We also reject Sachs's argument that because Suna made principal and interest payments in excess of $1,289,000, which was the liability limit on his guaranty, he is relieved of liability on the note notwithstanding that the remaining note balance was approximately $2.3 million. There is no language in either the note or the guaranty to support this claim or to support any interpretation of the guaranty other than the straightforward one that to the extent Suna remained liable on the note, Sachs was bound to guaranty payment up to an amount of $1,289,000.
 
 II. The Valuation
 
 22
 At trial, Appellants spent considerable energy contesting the low valuation claimed by the FDIC for the foreclosed condominiums. They did so, of course, because the lower the valuation, the higher the deficiency between the valuation and the unpaid face amount of the note plus interest for which they would be liable. The district court having accepted the FDIC's proposed valuation, Appellants now challenge the valuation in two ways. First, they argue that the FDIC expert's proposed valuation cannot be accepted as a matter of law. Second, they argue that to the extent that the district court relied upon the testimony of the FDIC's rebuttal expert as affirmative evidence to support the FDIC's proposed valuation, it was in error.
 
 A. Reliability of FDIC Expert Royce
 
 23
 Under Connecticut law, in a proceeding for a deficiency judgment, the plaintiff has the burden of proof of establishing, by a preponderance of the evidence, the value of the foreclosed property as of the date of the vesting of title to the property. See Eichman v. J & J Bldg. Co., 216 Conn. 443, 449, 582 A.2d 182, 185 (1990). The Connecticut courts have refused deficiency judgments where the plaintiff's valuation evidence has been found to be incredible. See, e.g., Farmers & Mechanics Sav. Bank v. Durham Realty, Inc., 34 Conn.App. 204, 640 A.2d 1017 (1994).
 
 
 24
 In its case-in-chief, the FDIC offered the testimony of expert Robert Royce. Royce valued the real estate on the basis of a sale of all of the property to a single purchaser and testified that he used a valuation methodology that was a blend of two approaches to valuation: direct sales comparison and income capitalization. Suna alleges that Royce's testimony was neither credible nor reliable.
 
 
 25
 Federal Rule of Evidence 702 provides as follows:
 
 
 26
 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
 
 
 27
 It is well-established that "expert testimony must be based upon reliable theories or principles." Glen Weissenberger, Federal Evidence 346 (2d ed.1995) (collecting cases). The Supreme Court recently stated as much in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, ----, 113 S.Ct. 2786, 2799, 125 L.Ed.2d 469 (1993) ("the trial judge [has] the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand"). However, the Daubert Court also made clear that " 'general acceptance' is not a necessary precondition to the admissibility of scientific evidence under the Federal Rules of Evidence" and that the Federal Rules of Evidence superseded the "general acceptance" test of Frye v. United States, 293 F. 1013 (D.C.Cir.1923). Daubert, 509 U.S. at ----, ----, 113 S.Ct. at 2793, 2799. The Court found that "a rigid 'general acceptance' requirement would be at odds with the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to "opinion" testimony.' " Id. at ----, 113 S.Ct. at 2794. However, the Court explained that "[t]he adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation." Id. at ----, 113 S.Ct. at 2795.
 
 
 28
 The Daubert Court stated that, in applying Rule 702, district courts should consider several factors: (1) whether the theory or technique "can be (and has been) tested;" (2) "whether the theory or technique has been subjected to peer review and publication;" and (3) the "known or potential rate of error" associated with a particular scientific technique. Id. at ---- - ----, 113 S.Ct. at 2796-97. The Court was, however, careful not to "presume to set out a definitive checklist or test." Id. at ----, 113 S.Ct. at 2796. For example, the Court stated that "[p]ublication ... does not necessarily correlate with reliability;" that "in some instances well-grounded but innovative theories will not have been published;" and that "[s]ome propositions ... are too particular, too new, or of too limited interest to be published." Id. at ----, 113 S.Ct. at 2797. The Daubert Court expressed confidence in the capacity of federal judges to make the appropriate validity and relevance inquiries.
 
 
 29
 Suna argues that "Royce's opinion testimony was based upon a developmental analysis unknown to appraisal literature, unique to him and on factual assumptions which were without any reasonable foundation." The FDIC accurately notes that it was the job of the magistrate judge hearing the case to make the determinations about reliability and relevancy. We should not disturb the findings of Magistrate Eagan unless they are clearly erroneous. See Carter v. South Cent. Bell, 912 F.2d 832, 841 (5th Cir.1990) ("A magistrate trying a case with the consent of the parties is entitled to the same deference that is given to findings of a district judge."), cert. denied, 501 U.S. 1260, 111 S.Ct. 2916, 115 L.Ed.2d 1079 (1991); see also American Soc'y of Composers, Authors & Publishers v. Showtime/The Movie Channel, Inc., 912 F.2d 563, 569 (2d Cir.1990). While Royce's testimony is lengthy and not as clear as we might wish, there is ample evidence to support the position taken by the district court. For example, Royce testified at several points that the valuation method he used was a hybrid of two widely-recognized methods and was the most appropriate method for valuing the class of property at issue. Suna argues that certain portions of Royce's testimony contradicted other portions. While this may in fact be true, it was for the district court, in its discretion, to determine the relative weight to place on the differing portions of the testimony. We are unable to conclude that Magistrate Eagan abused his discretion in finding that Royce's testimony was reliable and relevant.
 
 B. The Rebuttal Testimony
 
 30
 Magistrate Eagan allowed an FDIC witness, John LoMonte, to testify in rebuttal but made clear that LoMonte's testimony was to be confined to a rebuttal of the testimony of Sachs's appraisal expert, Norman Benedict. Magistrate Eagan stated:
 
 
 31
 I will allow you to put him on to rebut anything that Mr. Benedict has said, and that may mean that he just has a different opinion of that. The only thing that Mr. Benedict testified to was on a comparison basis. He did not testify on any other basis than that. So I'm sure I would not allow it on any other method of appraisal because that would be just a chance for you to get a second bite of the apple.
 
 
 32
 Suna asserts not only that LoMonte did not restrict his testimony to rebuttal of Benedict's testimony, but also that Magistrate Eagan impermissibly relied on the improper portions of the LoMonte testimony in adopting the FDIC valuation. Suna claims that "[a]s a matter of law, the testimony of LoMonte should not have been used as a basis for valuing the Property." Suna offers no authority to support this argument, nor have we been able to locate any. To the contrary, it is well-settled that "[a] district court has wide discretion in determining whether to permit evidence on rebuttal." United States v. Tejada, 956 F.2d 1256, 1266 (2d Cir.), cert. denied, 506 U.S. 841, 113 S.Ct. 124, 121 L.Ed.2d 80 (1992); see also United States v. Hiss, 185 F.2d 822, 832 (2d Cir.1950) (Whether certain testimony should have been received in rebuttal is a "matter[ ] so clearly within the discretion of the judge ... that we think no more need be said.... [W]hat is within the scope of permissible contradiction is largely a matter of avoiding confusion of issues, and as such should be left to the discretion of the trial judge."), cert. denied, 340 U.S. 948, 71 S.Ct. 532, 95 L.Ed. 683 (1951). Nothing in the record of this case leads us to conclude that Magistrate Eagan abused his discretion in allowing LoMonte's testimony and in taking it into consideration in reaching his decision.
 
 CONCLUSION
 
 33
 For the foregoing reasons, we affirm the judgment of the district court.
 
 
 
 [1]
 Celentano, a defendant below, filed a notice of appeal but did not file a brief. We therefore address any claims he may have only to the extent that they are raised by Suna and Sachs
 
 
 [2]
 Because the parties consented to a full trial before a magistrate and agreed that any appeal would be to the circuit court rather than to a district judge, the January 13, 1995 document signed by Magistrate Eagan was a final appealable order. The document was erroneously styled a "recommended ruling," which apparently led counsel for Suna to file objections (on January 30, 1995) and also led District Judge Dorsey to enter an "Endorsement of Magistrate's Ruling" (on February 3, 1995). Notwithstanding this technical error, the parties do not dispute the finality of Magistrate Eagan's judgment or our ability to review the same