110 F.3d 927
 37 Fed.R.Serv.3d 445
 DURAFLEX SALES & SERVICE CORPORATION, Plaintiff-Appellant,
v.
W.H.E. MECHANICAL CONTRACTORS; First National Bank of
Stamford; Pierre Bellegarde, doing business as Bellegarde
Interiors; Annex Painting Company; Kaufman Enterprises;
Charter Federal Savings & Loan Association, now known as
Charter Federal Savings Association; Cascio, Bechir &
Associates, Inc.; East Haven Builders Supply, Inc.;
Dolores Vartuli; V.F. Partnership, Defendants-Appellees,
Resolution Trust Corporation; Ippona LLC,
Consolidated-Defendants-Appellees,
Hemingway Center Limited Partnership, Defendant-Appellee.
 No. 39, Docket 95-9018.
 United States Court of Appeals,Second Circuit.
 Argued Oct. 23, 1996.
Decided April 3, 1997.
 
 Raymond A. Garcia, New Haven, CT (Constantine G. Antipas, Garcia & Associates, P.C., on the brief), for Plaintiff-Appellant Duraflex Sales & Service Corporation.
 James R. Fogarty, Greenwich, CT (Jennifer Paul Cohen, Epstein Fogarty Cohen & Selby LLC, on the brief), for Defendants-Appellees Ippona LLC and Hemingway Center Limited Partnership.
 Before: VAN GRAAFEILAND, WINTER, and JACOBS, Circuit Judges.
 JACOBS, Circuit Judge:
 
 
 1
 The federal and state issues of law on this appeal turn on the priority of liens resulting from the following sequence of events: (1) the filing of a first mortgage lien securing a construction loan; (2) the recordation of a mechanic's lien on the mortgaged premises; (3) the subordination of part of the first mortgage lien in favor of a new lender whose funds were thought sufficient to complete the construction project; (4) the collapse of the construction enterprise; (5) the takeover by the Resolution Trust Corporation ("RTC") of the bank that issued the original construction loan.
 
 
 2
 In the ensuing litigation, the mechanic's lienor asserts that its lien is prior in right to all other encumbrances on the property because the first mortgage (succeeded to by the RTC) was subordinated to the later mortgage which in turn post-dated the filing of the mechanic's lien. This claim potentially raises (i) federal issues under the D'Oench Duhme doctrine (codified at 12 U.S.C. § 1823(e)), which limits the enforceability against the RTC of certain transactions that may mislead bank examiners, as well as (ii) state law questions concerning circuity of liens.
 
 
 3
 The district court granted summary judgment in favor of the RTC, reasoning that under the D'Oench Duhme doctrine, the subordination agreements could not be enforced against the RTC. We affirm, but we do so without deciding the vexed and novel D'Oench Duhme issues because we conclude that even if the subordination agreements are enforceable against the RTC, the priority of the mechanic's lien would not be improved under state law.
 
 BACKGROUND
 
 4
 This is a consolidated foreclosure action commenced by participants in a failed real estate venture known as Hemingway Center Condominium. At various times, various participants in the venture have tried to foreclose on their respective interests in the project. This appeal focuses on the priority vis-a-vis other liens of the mechanic's lien filed by plaintiff-appellant Duraflex Sales and Service Corporation ("Duraflex"). We adduce the facts of Duraflex's claim and reference other aspects of this case only insofar as they bear on that claim.
 
 
 5
 Hemingway Center is a mixed commercial and residential condominium project in New Haven, Connecticut that was developed by Vincent Vartuli, a general partner in Hemingway Center Limited Partnership ("Hemingway"). Originally, the project was planned to consist of three separate buildings, two residential and one retail.
 
 
 6
 On October 29, 1987, Hemingway Center and Vincent Vartuli borrowed $3.95 million from Charter Federal Savings & Loan ("Charter Federal"), and executed a Construction Mortgage Note in that amount secured in part by a mortgage on the five acre site of the project (the "Charter mortgage"). As further security for the note, Hemingway mortgaged a second parcel of land in New Haven. In August 1989, Vartuli executed another mortgage in favor of Charter Federal which was secured by his home in Greenwich, Connecticut.
 
 
 7
 In the fall of 1988, plaintiff Duraflex agreed with Hemingway to provide $248,900 worth of precast concrete panels for the floors and ceilings in two of the three buildings at the project. Duraflex delivered the panels between February and September 1989, but Hemingway failed to make full payment. On October 31, 1989, Duraflex served a mechanic's lien on Hemingway Center for the estimated balance due of $79,100, and filed the lien on the New Haven land records.
 
 
 8
 In the fall of 1989, after it became clear that the Hemingway project could not be completed without additional funds, Vartuli sought an $850,000 loan from First National Bank of Stamford ("FNBS"). To effect and facilitate that transaction, Hemingway, Charter Federal, and FNBS executed a series of transactions as of October 25, 1989, as follows:
 
 
 9
 (a) In order to establish the property as a common interest ownership community pursuant to the Connecticut Common Interest Ownership Act, Hemingway executed a Declaration of Condominium ("Declaration"), by which it established 40 condominium units.
 
 
 10
 (b) Hemingway Center and Charter Federal executed a Subordination and Collateral Assignment Agreement, whereby Charter Federal subordinated its rights under the Charter Mortgage to the Declaration of Condominium. The parties "agreed that Lender shall subordinate its rights under the mortgage to the Declaration and that Borrower shall assign its rights as Declarant as additional security for the Mortgage."
 
 
 11
 (c) Hemingway and FNBS entered into a similar Subordination and Collateral Assignment Agreement whereby FNBS also subordinated its rights under the FNBS mortgage to the Declaration of Condominium.
 
 
 12
 (d) In order to induce FNBS to extend the $850,000 loan for the ailing project, Hemingway and Charter Federal entered into another subordination agreement (the "FNBS Subordination Agreement"), by which Charter Federal subordinated its rights under the original mortgage as it pertained to ten units of the Hemingway condominiums, to the FNBS mortgage in the amount of $850,000. The Agreement further provided that except for the ten subordinated units, "the Mortgage of Charter shall remain and constitute a first mortgage lien on said premises."[1]
 
 
 13
 (e) Hemingway Center, Vartuli and others executed and delivered to FNBS a note in the amount of $850,000 (the "FNBS Note") that was secured by a mortgage deed in the amount of $850,000 in favor of FNBS on a parcel of land in Greenwich, Connecticut and the ten units of the Hemingway Condominium subordinated by Charter Federal. (According to Duraflex, some of the $850,000 advanced by FNBS was used to pay down the obligation to Charter Federal.)
 
 
 14
 The additional $850,000 was evidently not enough, and the Hemingway condominium project was never completed.
 
 
 15
 On June 28, 1990, the Office of Thrift Supervision appointed the RTC as receiver of Charter Federal.
 
 
 16
 Thereafter, various participants in the Hemingway venture brought actions seeking to foreclose their various interests in the project. All of the actions that were not previously dismissed were consolidated before the district court on April 14, 1992.[2]
 
 
 17
 As part of that consolidated action, Duraflex asserted a claim that its mechanic's lien was prior in right to all encumbrances on the property, including the mortgages held by the RTC. The RTC moved for summary judgment on this claim, among others, arguing that 12 U.S.C. § 1823(e) bars the use of the subordination agreements to defeat the full priority of the Charter Federal Mortgage. That section--like its common law counterpart, the D'Oench Duhme doctrine--prevents the enforcement of agreements which tend to diminish the RTC's interest in any asset unless the agreements satisfy enumerated requirements.
 
 
 18
 In a Recommended Ruling dated August 4, 1994, Magistrate Judge Eagan recommended granting the RTC's motion for summary judgment. He concluded that because the subordination agreements did not meet all of the requisites of 12 U.S.C. § 1823(e), the agreements could not be enforced to defeat the RTC's priority over the Duraflex lien. Specifically, the Magistrate Judge found that the subordination agreements failed to meet the requirement of "contemporaneous execution," and the requirement of approval by the Board of Directors or Loan Committee reflected in committee minutes. The Recommended Ruling was affirmed, approved, and adopted by the district court (without opinion) on December 14, 1994.
 
 
 19
 On December 30, 1994, Duraflex moved for entry of final judgment pursuant to Fed.R.Civ.P. 54(b), on the ground that "[s]ince the court has already issued a final order determining the priorities on the Hemingway Center property, and under those holdings, there is not sufficient equity to protect Duraflex's mechanic's lien on the property, it would be a waste of time and money for the parties and the court to proceed with a trial between Duraflex and Hemingway Center."
 
 
 20
 The district court never acted upon this motion, and a bench trial went forward before Magistrate Judge Eagan in May 1995. On June 19, 1995, Magistrate Judge Eagan issued a recommended memorandum of decision awarding Duraflex $76,100 on its mechanic's lien plus reasonable attorney's fees. Judge Daly adopted this decision on September 11, 1995; and Duraflex filed a notice of appeal from that order.
 
 
 21
 In the meantime, Judge Daly issued a judgment of strict foreclosure in the consolidated cases on June 30, 1995, in accordance with the previously determined priorities. Duraflex also filed a notice of appeal from that decision.
 
 
 22
 As set forth at some length below, we first reject the RTC's assertion that this appeal is untimely, and then proceed to consider the federal and state issues presented by the parties. Duraflex cannot establish the priority it seeks for its mechanic's lien unless (i) the subordination agreements withstand scrutiny under the federal statute and (ii) the effect of the subordination agreements is to improve Duraflex's lien priority under Connecticut common law. The district court decided the case under the federal statute, a ground of decision that requires resolution of two appellate issues. We need not decide these federal issues, however, because we can resolve this appeal on the available ground under state common law.
 
 DISCUSSION
 A. Timeliness of Appeal
 
 23
 According to defendants, this appeal is untimely because the issue appealed by Duraflex--the priority of its mechanic's lien--was effectively determined long before, on December 14, 1994, when the district court decided the RTC's summary judgment motion. The defendants argue that the grant of summary judgment should be considered to have been a final and appealable order because the sum value of the liens so far exceeded the value of the property that Duraflex lost the prospect of recovering any damages (regardless of the validity or amount of its mechanic's lien) when the court decided that Duraflex could not assert its lien ahead of Charter Federal's mortgage, and because Duraflex failed to appeal until the district court subsequently determined the value of the lien and issued a judgment of strict foreclosure.
 
 
 24
 We disagree. The determination that the Charter Federal mortgage had priority over the Duraflex lien was not a final judgment. Duraflex commenced an action to foreclose its mechanic's lien and this action was consolidated with other foreclosure actions involving the same property. The grant of summary judgment to the RTC concerning the priority of its lien did not invalidate the Duraflex mechanic's lien, which still remained and which thereafter became the subject of a bench trial to determine its value. It may be that the priority of the liens foreclosed any likelihood that Duraflex would ever collect, no matter what the value of its lien, and that the subsequent trial was unnecessary; but if so, the parties could have obviated the trial by proffering a stipulation on a matter supposedly of no consequence. In any event, "when there is a judgment in a consolidated case that does not dispose of all claims which have been consolidated, there is a strong presumption that the judgment is not appealable absent Rule 54(b) certification." Hageman v. City Investing Co., 851 F.2d 69, 71 (2d Cir.1988).[3]
 
 
 25
 Duraflex thus acted properly in moving for final judgment under Rule 54(b) of the Federal Rules of Civil Procedure, which sets forth the requirements for the entry of a partial final judgment in multi-claim or multi-party actions. Under Rule 54(b), an order that "adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties" is not a final judgment unless the district court makes "an express determination that there is no just reason for delay and ... an express direction for the entry of judgment." This Court has strictly adhered to the certification requirement of Rule 54(b). See Kahn v. Chase Manhattan Bank, N.A., 91 F.3d 385, 387 (2d Cir.1996); In re Martin-Trigona, 763 F.2d 135, 139 (2d Cir.1985). The district court did not act upon Duraflex's Rule 54(b) motion, and thus its order never became a final judgment. Duraflex's appeal from the order of strict foreclosure was therefore proper and timely.
 
 B. D'Oench, Duhme
 
 26
 We review a grant of summary judgment de novo. Briones v. Runyon, 101 F.3d 287, 291 (2d Cir.1996). Summary judgment is proper only where no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.1996). We may however affirm the district court on any ground that finds support in the record. United States v. International Brotherhood of Teamsters, 948 F.2d 1338, 1347 (2d Cir.1991).
 
 
 27
 The district court held that the RTC was entitled to summary judgment on Duraflex's claim because the subordination agreements were unenforceable against the RTC under 12 U.S.C. § 1823(e), the statutory codification of the common-law "D'Oench Duhme doctrine." Put simply, the D'Oench Duhme doctrine "precludes obligors from asserting side deals or secret agreements which may mislead bank examiners against the [RTC]." RTC v. Midwest Fed. Sav. Bank of Minot, 36 F.3d 785, 793 (9th Cir.1994) (citation omitted).
 
 
 28
 The doctrine was first articulated by the Supreme Court in D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), in which the FDIC sued to enforce a promissory note that it had acquired from a failed bank. The maker interposed as a defense that the note was given without consideration and upon the understanding that it would never be called for payment. In rejecting this defense, the Court relied on the federal policy of protecting federal corporations "from misrepresentations made to induce or influence the actions of [the FDIC], including misstatements as to the genuineness or integrity of securities in the portfolios of banks which it insures or to which it makes loans." Id. at 459, 62 S.Ct. at 680; see also FDIC v. Suna Assocs. Inc., 80 F.3d 681, 684 (2d Cir.1996).
 
 
 29
 Congress codified the D'Oench, Duhme doctrine at 12 U.S.C. § 1823(e), as follows:
 
 
 30
 No agreement which tends to diminish or defeat the interest of the [RTC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [RTC] unless such agreement (A) is in writing, (B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution, (C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (D) has been continuously, from the time of its execution, an official record of the depository institution.
 
 12 U.S.C. § 1823(e)(1).[4]
 
 31
 Like the common law doctrine, "[o]ne purpose of § 1823(e) is to allow federal and state bank examiners to rely on bank's records in evaluating the worth of the bank's assets." Langley v. FDIC, 484 U.S. 86, 91, 108 S.Ct. 396, 401, 98 L.Ed.2d 340 (1987). The RTC cannot act with the necessary speed and accuracy in deciding whether to liquidate a bank or provide financing for the purchase of its assets "if bank records contain[ ] seemingly unqualified notes that are in fact subject to undisclosed conditions." Id. at 91-92, 108 S.Ct. at 401. A second purpose of § 1823(e) is "implicit in its requirement that the 'agreement' not merely be on file ... but also have been executed and become a bank record 'contemporaneously ' with the making of the note." Id. at 92, 108 S.Ct. at 401 (emphasis added). This requirement ensures mature consideration of unusual transactions and defeats the fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure. Id.
 
 
 32
 Under the common law doctrine, the question of whether a borrower's defense is barred "depends upon whether the purported agreement relied upon by the private party was ever memorialized in writing or otherwise made explicit such that ... the [RTC] would have knowledge of the bank's obligations during an evaluation of the bank's records." Suna Assocs., 80 F.3d at 684 (quoting FDIC v. McCullough, 911 F.2d 593, 600 (11th Cir.1990)). But in the codification, Congress opted for certainty: an agreement that meets the requirements of the statute survives "even if the [RTC] did not know of it; and an agreement that does not meet them fails even if the [RTC] knew." Langley, 484 U.S. at 95, 108 S.Ct. at 403.
 
 
 33
 This appeal potentially raises two difficult questions concerning § 1823(e): (1) whether the subordination agreements tend to prejudice the RTC's interests in the manner contemplated by the statute; and (2) if so, whether the contemporaneity requirement of the statute has been met.
 
 
 34
 The statute applies in this case only if the subordination agreements "tend[ ] to diminish or defeat the interest of the [RTC] in any asset acquired by it." 12 U.S.C. § 1823(e). We will assume that the relevant "asset" of the RTC is the Charter Federal mortgage on the Hemingway property. On their face, the subordination agreements in part relinquish Charter Federal's lien priority; on the other hand, the agreements were entered into in order to improve the cash position of the troubled project so that the project that secured Charter Federal's note could be completed. In short, the subordination agreements may have "tend[ed] to diminish" the value of the Charter Federal mortgage; but it is also possible that the asset value increased, or was essentially unaffected, depending upon when the value is measured and indeed on whether one views the relevant "asset" as being the mortgage or instead the mortgage note (which may be diminished by the subordination regardless of any cash influx). We therefore think that there are remaining issues of law and fact as to whether § 1823(e) should apply to the subordination agreements.
 
 
 35
 However, even if the subordination agreements do tend to diminish the relevant asset, resolution of this case under the federal statute would require decision of a second issue raised by Duraflex: whether, in light of commercial reality, the subordination agreements comply with the statute's requirement that agreements be "executed by the depository institution and any person claiming an adverse interest thereunder ... contemporaneously with the acquisition of the asset by the depository institution." 12 U.S.C. § 1823(e)(1)(B) (emphasis added). The district court ruled that the asset here is the mortgage and that the subordination agreements are unenforceable as against the RTC because the execution of the agreements was not contemporaneous with the mortgage transaction. However, a bank's agreement to subordinate its mortgage lien will ordinarily postdate the mortgage itself; thus the district court's approach might make nearly all subordination agreements unenforceable as against the RTC, and thereby impair the ability of any bank to grant such a concession in order to facilitate a transaction calculated to preserve or enhance the value of a security interest. Admittedly, a strict and categorical construction of the statute, which may very well be appropriate in light of Langley, 484 U.S. at 95, 108 S.Ct. at 403, would appear to render subordination agreements unenforceable against the RTC. But such a construction of the statute might not reflect the intention of Congress in imposing the contemporaneity requirement; and some courts have noted that commercial reality should be considered in applying the statute. See, e.g., FDIC v. Manatt, 922 F.2d 486, 489 n. 4 (8th Cir.1991) (contemporaneity requirement would not apply to valid accord and satisfaction agreements, which are never contemporaneous with initial documents incurring debt); RTC v. Midwest Fed. Sav., 36 F.3d at 797-98 (commitment letter rendered two months prior to final loan considered contemporaneous with loan because "contemporaneousness requirement should be considered in light of commercial reality").[5]
 
 
 36
 However, regardless of whether the district court erred in determining that the contemporaneity requirement had not been met, or for that matter, whether the subordination agreements tend to diminish the relevant asset, we can affirm on the basis of the issues presented under Connecticut common law. We do so because, even if the subordination agreements are enforceable against the RTC, the priority of the Duraflex mechanic's lien would not be altered by giving effect to those agreements.
 
 C. Connecticut Common Law
 
 37
 If, as Duraflex contends, the subordination agreements are enforceable against the RTC, the priority of the Duraflex mechanic's lien depends upon state law principles concerning the circuity of liens. Duraflex asserts that under the common law of Connecticut when Charter Federal subordinated a (relatively small) part of its mortgage to the FNBS mortgage, the Charter Federal mortgage surrendered priority not only as to the FNBS mortgage, but as to the mechanic's lien as well. We disagree.
 
 
 38
 We are presented with a variant of a classic "circular priority dilemma."[6] Charter Federal, as first lienholder, has subordinated a portion of its first lien to FNBS, the lienholder with third priority. The issue is what becomes of the relative priority of the original second lien filed by Duraflex, a lienholder not party to the subordination.
 
 
 39
 We are persuaded that the Supreme Court of Connecticut would resolve this issue through reasoning substantially similar to that employed in RJB Contracting Inc. v. Hi-G Co., Inc., No. CV 950466682S, 1995 WL 791952 (Conn.Super.Ct. Nov.28, 1995), a recent case from the Connecticut Superior Court. The circular priority issue in RJB resembles the one we consider here. General Electric claimed a first mortgage on certain property, upon which mechanic's liens were thereafter filed by (first) RJB and (then) Kennedy Electric. Later still, Congress Financial recorded an additional mortgage on the property and on the same day General Electric partially subordinated $275,000 of its first mortgage to Congress's later mortgage. RJB (the second priority lienholder) claimed that the subordination agreement improved its priority and that RJB's lien now took priority over those of Congress and General Electric.
 
 
 40
 The Superior Court rejected RJB's claim. Relying primarily on In re Cliff's Ridge Skiing Corp., 123 B.R. 753 (Bankr.Ct.W.D.Mich.1991), the court resolved the order of recovery among the lienholders as follows: (1) Congress, which recovers $275,000 under GE's senior lien pursuant to the subordination agreement; (2) General Electric, which recovers the balance of its original lien less the $275,000 subordinated to Congress; (3) RJB and Kennedy; (4) GE, which recovers on the remaining $275,000 of its lien; and (5) other lienholders in turn. RJB Contracting, 1995 WL 791952, at * 3. The court noted that under this scheme the intermediate lienholders, who (like Duraflex) were not parties to the subordination are not prejudiced "because they were always junior to [the first lienholder's] prior interest, regardless of whom it is paid to." Id.
 
 
 41
 Employing that scheme in the instant case, the priorities are as follows: (1) FNBS, which recovers $850,000 under Charter Federal's senior lien pursuant to the subordination agreements; (2) Charter Federal, which recovers the balance of its original mortgage less the $850,000 subordinated to FNBS; (3) Duraflex; and (4) Charter Federal, which recovers on the remaining $850,000 of its lien. Thus, Duraflex's lien priority is neither impaired nor improved by the $850,000 partial subordination of Charter Federal's lien in favor of FNBS--a subordination to which Duraflex was not a party.
 
 
 42
 In arguing that its lien should now have priority over all encumbrances on the property, Duraflex relies chiefly on Shaddix v. National Sur. Co., 221 Ala. 268, 128 So. 220 (1930), and McConnell v. Mortgage Inv. Co. of El Paso, 292 S.W.2d 636 (Tex.Civ.App.1956). These cases are unpersuasive. Shaddix, an Alabama Supreme Court case from 1930, articulates no rationale. See 128 So. at 224. McConnell is a relatively more recent case, decided by a Texas intermediate court, that does little more than cite Shaddix in reaching its conclusion. See 292 S.W.2d at 638.
 
 
 43
 Although these cases are of little help in resolving this appeal, we note that the RJB scheme employed here is not necessarily inconsistent with them. In Shaddix and McConnell, the lienholder with first priority subordinated all of that lien to the lienholder with third priority. Under the RJB analysis, had Charter Federal subordinated the whole of its $3.95 million mortgage to FNBS, then Charter Federal's lien priority would have been entirely subordinate to the Duraflex mechanic's lien. And, in the absence of any stated rationale in Shaddix and McConnell, we read those cases to say no more than when a first lienholder subordinates its entire lien to the lien of a third lienholder, the original first lien is subordinated to the liens of both the second and third lienholders. See Shaddix, 128 So. at 224; McConnell, 292 S.W.2d at 638. In RJB, Shaddix, and McConnell, the second lienholder was left in a position no worse or better than it would have been in, absent the subordination.
 
 
 44
 As Duraflex points out, (i) RJB relies largely on In re Cliff's Ridge Skiing Corp., 123 B.R. at 767; (ii) Cliff's Ridge in turn adopted the reasoning of the Texas Supreme Court in ITT Diversified Credit Corp. v. First City Capital Corp., 737 S.W.2d 803 (Tex.1987); and (iii) ITT, which decided a lien-priority issue concerning personal property, distinguished McConnell on the ground that McConnell stated the rule governing liens on real property. 737 S.W.2d at 804. Duraflex therefore argues that on this appeal--which involves liens on real property--we should follow the McConnell rule and distinguish ITT and Cliff's Ridge on the ground that they furnish the rule only in cases involving liens on personalty.
 
 
 45
 We see no valid basis for the distinction Duraflex seeks to draw between real property and personalty. The reasoning of RJB and Cliff's Ridge is principled and sound, and does not seem to depend on the character of the property to which the liens attach. We think the reasoning of these cases would be applied by the Supreme Court of Connecticut to the Duraflex lien.[7]
 
 
 46
 The result in this case is also supported by the Supreme Court of Connecticut's often repeated observation that mechanic's liens are premised upon equitable interests which turn on the nature of the contract between the lienor and the property holder. See generally Centerbrook, Architects and Planners v. Laurel Nursing Servs., Inc., 224 Conn. 580, 586-92, 620 A.2d 127 (1993) (citing cases). Duraflex was not a party to the subordination agreements, and we therefore see no equitable reason why the priority of the Duraflex mechanic's lien should be improved (or impaired) as a result of agreements to which Duraflex was not a party.
 
 
 47
 The goal of the Connecticut mechanic's lien statute is to provide a remedy in the form of security for a contractor's labor and materials. See Conn. Gen.Stat. § 49-33; Camputaro v. Stuart Hardwood Corp., 180 Conn. 545, 550, 429 A.2d 796 (1980). The RJB scheme, as we apply it in this case, serves that goal because the relative priority of the Duraflex mechanic's lien is unaffected. Duraflex's position, if adopted, would raise barriers to subordination agreements and reduce incentives for entering into them. Yet such agreements accelerate the flow of cash to troubled projects--financial relief that promotes the development of assets that secure payments to all lienholders.
 
 
 48
 In light of all these considerations, we hold that under Connecticut law, the relative priority of the Duraflex mechanic's lien would not be improved by the subordination agreements of Charter Federal and FNBS, assuming without deciding that such agreements are valid and enforceable against the RTC. We therefore need not reach the question of the validity of the agreements under 12 U.S.C. § 1823(e).
 
 CONCLUSION
 
 49
 The judgment of the district court granting summary judgment in favor of the RTC on Duraflex's claim of priority is affirmed.
 
 
 
 [1]
 The full text of the FNBS Subordination Agreement provides in relevant part:
 WHEREAS, the Owner [Hemingway] is about to borrow money from FIRST NATIONAL BANK OF STAMFORD in the amount of Eight Hundred Fifty Thousand Dollars ("$850,000.00") to be secured by a first mortgage covering ten units of Hemingway Center Condominium located on the above described premises ... and to pay down the first mortgage lien of Charter on said premises; and
 WHEREAS, in order to obtain said additional money, Charter has heretofore agreed and consented to subordinate the Mortgage as it pertains to those ten (10) units of Hemingway Center Condominium described in Schedule B so held by it to the lien of the mortgage about to be made by the Owner to FIRST NATIONAL BANK OF STAMFORD.
 NOW THEREFORE, in consideration of the sum of $1.00 and of the mutual promises herein contained, Charter, its successors and assigns, do hereby covenant, consent and agree that the said Mortgage as it pertains to those ten (10) units of Hemingway Center Condominium described in Schedule B held by it is and shall be subject and subordinate to a mortgage from Hemingway Center Limited Partnership to FIRST NATIONAL BANK OF STAMFORD in the amount of Eight Hundred Fifty Thousand Dollars ($850,000.00), and recorded contemporaneously with this Agreement, and that except for that portion of the Premises described in Schedule B the Mortgage of Charter shall remain and constitute a first mortgage lien on said premises.
 
 
 [2]
 On December 4, 1992, FNBS, Hemingway, Vincent Vartuli, the Vartuli Family Partnership ("VF Partnership"), and Varkam Associates entered into an agreement whereby VF Partnership acquired all rights, title and interest in the FNBS Note and Mortgage. VF Partnership was later substituted for FNBS in this action
 
 
 [3]
 Defendants cite Kamerman v. Steinberg, 891 F.2d 424 (2d Cir.1989) as an example of a case in which this presumption was overcome. However in that case the district court relied in part on the fact that the district court clearly intended final judgment to be entered with respect to the claim and explicitly stated this on the record. Id. at 428-30. In this case, there was no such intent and, as mentioned, a bench trial was held on Duraflex's claim
 
 
 [4]
 Due to a mounting crisis in the banking and thrift industry, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101-73, 103 Stat. 183, which expanded the applicability of § 1823(e) to the newly created RTC in either its corporate or receivership capacity. FIRREA also added 12 U.S.C. § 1821(d)(9)(A), which explicitly extended the protection of § 1823(e) to affirmative claims against the banking authority
 
 
 [5]
 The district court also determined that Charter Federal's subordination of its mortgage to the Declaration of Condominium did not satisfy § 1823(e)'s requirement that the agreement be recorded in the minutes of the loan committee meeting. However, the Charter Federal subordination of the ten condominium units to the FNBS mortgage were so recorded, and it is this agreement that is central to Duraflex's claim of priority. We need go no further with this issue under 12 U.S.C. § 1823(e), however, because we affirm on the basis of the underlying state law question
 
 
 [6]
 We disagree with the observation of one noted scholar that, "A judge who finds himself face to face with a circular priority system typically reacts in the manner of a bull who has been goaded by the picadors: he paws the ground and roars with rage. The spectator can only sympathize with judge and bull." G. Gilmore, Security Interests in Personal Property § 39.1, at 1020-21 (1965)
 
 
 [7]
 Moreover, as noted above, McConnell holds only that when a first lienholder subordinates its entire lien to a third lienholder, the first lien is then subordinate to both the second and the third liens. Again, this same result is reached under the RJB scheme which governs this case