Louis PUGLIANO

v.

UNITED STATES of America

Frank Pugliano

v.

United States of America

Gaetano J. Milano

v.

United States of America

Nos. Civ. 395CV1171AHN, Civ.
395CV1330AHN, Civ.
395CV1145AHN.
No. CR. H90–18AHN.

United States District Court,
D. Connecticut.

Jan. 30, 2004.

John M. Thompson, Thompson & Thompson, Springfield, CT, Craig A. Raabe, Robinson & Cole, Hartford, CT, Wendy Sibbison, Greenfield, MA, for Plaintiffs.

James K. Filan, Jr., U.S. Attorney's Office, Bridgeport, CT, for Defendants.

Vincent A. Bongiorni, Springfield, MA, for Petitioner/Respondent.

## RULING ON ADMISSIBILITY OF EXPERT TESTIMONY

NEVAS, District Judge.

In this habeas corpus action under 18 U.S.C. § 2255, the petitioners assert that they were denied their Sixth Amendment and statutory[1] right to a jury comprised of a fair cross section of the community. The basis of this claim is that a defect in the Master and Qualified Wheels caused a systematic and substantial under-representation of African–Americans and Hispanics in the venire from which their petit jury was drawn. Because this claim was not raised on direct appeal, the petitioners must establish (1) cause for failing to timely raise the jury composition challenge, i.e., some objective factor external to the defense that made the defect unreasonably unknown, and (2) prejudice from the constitutional defect.

To support their claim of prejudice, the petitioners rely on the expert testimony of Fletcher Blanchard, Ph.D., ("Dr.Blanchard"), a social psychologist. The gist of Dr. Blanchard's opinion is that a racially and ethnically heterogeneous jury is less likely to convict a criminal defendant, regardless of his or her race. This is so, according to Dr. Blanchard, because (1) African–Americans and Hispanics bring to the jury room a heightened skepticism and distrust of judges, local prosecutors, and the FBI; (2) African–Americans are significantly more likely to favor acquittal than are whites; (3) racial and ethnic heterogeneity among jurors is likely to improve jury deliberations by increasing the duration and increasing the level of constructive confrontation within the group; and (4) the exclusion of even a small number of African–Americans from a jury can alter the outcome of deliberations primarily because of the unanimity requirement and the "beyond a reasonable doubt" standard.

Before the court can reach the merits of the petitioner's § 2255 claim, it is required to exercise its gatekeeping function to determine whether Dr. Blanchard's opinion testimony is admissible. See Fed.R.Evid. 702, Advisory Committee Notes, 2000 Amendments; Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). To discharge this responsibility, the court held a Daubert hearing at which Dr. Blanchard testified

---

1. See Jury Selection & Service Act, 28 U.S.C. § 1861.

on direct and cross-examination. The court also reviewed his expert report, affidavit and the parties' legal memoranda. Based on the foregoing, the court concludes that the petitioners have not established by a preponderance of the evidence that Dr. Blanchard's testimony rests on a reliable foundation. *See Daubert,* 509 U.S. at 597, 113 S.Ct. 2786; *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Amorgianos v. National R.R. Passenger Corp.,* 303 F.3d 256, 265 (2d Cir.2002).

### STANDARD

■ To assess the reliability of a proffered expert's testimony, the court's inquiry under *Daubert* and its progeny must focus on whether his conclusions are based on a reliable foundation, not on the substance of his conclusions or whether they are correct. *See Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 744 (3d Cir.1994); *Campbell v. Metropolitan Prop. & Cas. Ins. Co.,* 239 F.3d 179, 184–85 (2d Cir. 2001). Expert testimony is admissible under Fed.R.Evid. 702 when (1) it is grounded on sufficient facts or data, (2) is the product of reliable principles and methods, and (3) the principles and methodology are properly applied to the facts of the case. *See Amorgianos,* 303 F.3d at 265. Whether the expert bases his testimony on professional studies or personal experience, he must employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire,* 526 U.S. at 152, 119 S.Ct. 1167. "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Heller v. Shaw Indus.,* 167 F.3d 146, 155 (3d Cir.1999). In deciding whether a step in an expert's analysis is reliable, the court must undertake a rigorous examination of the data on which the expert relies, the method by which he draws his opinions from such studies and data, and the application of the data and methods to the case at hand. *See Amorgianos,* 303 F.3d at 267. The proponent of the testimony must present enough evidence to demonstrate the scientific validity of the research supporting the conclusions so that the court can determine whether the testimony is well-founded. "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible. The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." *Amorgianos,* 303 F.3d at 267 (quoting *Paoli,* 35 F.3d at 747).

### DISCUSSION

Without regard to Dr. Blanchard's conclusions, the court finds that his testimony and conclusions are not generated by a reliable methodology and are not based on a reliable foundation, but are merely the product of his subjective belief and unsupported speculation. *See Daubert,* 509 U.S. at 597, 113 S.Ct. 2786; *Campbell,* 239 F.3d at 184. There is simply too great an analytical gap between the professional studies and opinion poll data on which he relies and the conclusions he reaches based on these sources. *See General Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (citing *Turpin v. Merrell Dow Pharm., Inc.,* 959 F.2d 1349, 1360 (6th Cir.1992)). As another court noted in reaching the same conclusion, it appears that Dr. Blanchard's testimony is connected to the research merely by *ipse dixit. See Turpin v. Merrell Dow Pharm., Inc.,* 959 F.2d 1349, 1360 (6th Cir.1992); *see also Joiner,* 522 U.S. at 146, 118 S.Ct. 512 ("[e]xperts commonly extrapolate from existing data, but nothing in either *Dau-*

*bert* or the Federal Rules of Evidence requires a court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert"). Although the petitioners claim that the court must find Dr. Blanchard's opinion testimony reliable simply because "it is based on his experience, training and education in the research methods he used to evaluate the published, peer-reviewed research which constituted the data he relied on in formulating that opinion," The case law clearly contradicts this assertion. Based on an assessment of the relevant Rule 702 factors, the court finds that Dr. Blanchard's testimony does not have a sufficiently reliable foundation to permit it to be considered. *See Daubert,* 509 U.S. at 597, 113 S.Ct. 2786.

### A. The Data On Which the Expert Relied

■ According to his testimony and affidavit, Dr. Blanchard obtained the data to formulate his opinion from thirty-three published professional studies. But Dr. Blanchard does not quote from or discuss the studies. He merely provides cursory conclusions reached in some of the research on which he claims to have relied. He also did not provide copies of this literature to the court. Such an offer of proof is legally insufficient. *See United States v. Rincon,* 28 F.3d 921, 924 (9th Cir.1994) (holding that expert testimony that is drawn from research of others can be excluded if the court is not given sufficient information to determine if it is valid and supports the expert's opinion); *O'Conner v. Commonwealth Edison Co.,* 807 F.Supp. 1376, 1392 (C.D.Ill.1992) ("The mere recitation of a list of studies is not a magical incantation paving the way to the

witness stand unless it is accompanied by reasoned and scientifically accepted analysis."). Given the paucity of detail the court is unable to make the findings required by Rule 702 and determine if the research is a reliable and valid foundation for his conclusions. *See Claar v. Burlington Northern RR Co.,* 29 F.3d 499, 502 (9th Cir.1994). This is so even where, as here, the expert believes such details are not necessary because he feels confident in representing the findings to the court. *See Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.,* 559 F.Supp. 1189, 1205 (E.D.N.Y.1983) quoting 3 Louisell & Mueller, Federal Evidence @ 387 at 652 (1979) ("Rule 703 does not abdicate judicial responsibility to the expert for it leaves room for rejection of testimony if reliance on the facts and data is unreasonable").

Further, not only does Dr. Blanchard fail to provide information that would allow the court to independently determine the validity of the research on which he relies, his sketchy, bare-bones summaries of the conclusions of some, but not all, of the research and literature are also woefully inadequate.[2] By way of illustration, Dr. Blanchard testified that one study, which he did not identify, concluded that African–Americans had significantly more negative attitudes toward FBI agents than whites. Similarly, the scant information he provided to the court about other studies was simply that "the population surveys, these national surveys that I uncovered, found substantial differences in the direction of African–Americans being less trusting and more skeptical of judges than Anglo–Americans and Hispanics as well in one regional survey." His description of another study involving the behavior of lawyers in jury selection was simply that it identified "a pattern whereby prosecutors

---

**2.** Dr. Blanchard's bare-bones affidavit is similarly devoid of any details of the research on which he relied in formulating his opinions and conclusions. Rather, it is comprised entirely of generalized conclusions without explanation or source attribution.

disproportionately challenge African–American prospective jurors and defense attorneys disproportionately challenge European American prospective jurors."

The reliability and trustworthiness of the foundation of Dr. Blanchard's opinions and conclusions are further impugned by the testimony elicited on cross-examination. For instance, although one of Dr. Blanchard's conclusions from the research is that African–Americans have less favorable attitudes towards the FBI, local police, and the justice system, he conceded on cross-examination that one of the articles he cited actually found that "socioeconomic factors such as race, age, and income appear to have little direct effect on attitudes toward police." He also agreed that another study he cited found that race, at best, is a weak predictor of sentiment toward police. In the same discrediting vein, he admitted that the study pertaining to grand juries actually found that minority representation is associated with higher indictment rates. On redirect, the petitioners' were unable to rehabilitate Dr. Blanchard's testimony regarding these studies. Dr. Blanchard only commented that the articles were very sophisticated and complex, but he did not explain why the studies appeared to contradict his testimony. This impeachment further illustrates why the court may not simply accept an expert's assertion that his testimony is well-grounded in professional studies and published data.

In sum, the totality of Dr. Blanchard's testimony regarding the professional studies and data upon which he relied to formulate his opinion is simply inadequate for the court to determine whether it is reliable and supportive of his conclusions.

B. *The Methodology Used by the Expert*

According to Dr. Blanchard, he used a three-fold method to formulate his opinion: first, he reviewed opinion data to 1991 regarding attitudes of people of color towards criminal justice officials and institutions; second, he reviewed research literature regarding the role and impact of racial or ethnic diversity on decision making in small groups, including juries, with a focus on the way in which factions that are a numerical minority in a jury can influence its decision-making process; and third, he combined the results of these two research surveys to form his own opinions and conclusions. As the petitioners noted, his methodology is unique.

Dr. Blanchard stated that he read each of the articles several times, carefully looked at the research methods, weighed the conclusions and the language in which the articles were written, and looked for statistically significant differences. But Dr. Blanchard did not offer any other insight into his analysis, and although he stated that he did not consider whether the evidence in a case or the oath taken by jurors would have any effect on his conclusions, he did not advise whether or not he considered any other variables.

Dr. Blanchard has not done any independent research on the subject of his expert testimony and has not published any articles on the topic. Although he said he had studied individual behavior in small groups that were "like juries," he did not provide any details of the small groups or explain how they were "like juries," i.e., whether they were under a sworn duty to follow the law as instructed by the court and render an impartial verdict free from bias, sympathy and prejudice. Notably, he stated that he never interviewed anyone who had served on a criminal jury, even though doing so would have allowed him to test his opinions and conclusions.

There is also no evidence that Dr. Blanchard's conclusions can be or have

been tested, whether they have been subjected to peer review or publication, whether there is any known or potential rate or error for such conclusions, or whether his opinions have gained general acceptance in the field. *See Daubert,* 509 U.S. at 593, 113 S.Ct. 2786; *FDIC v. Suna Assoc.,* 80 F.3d 681, 687 (2d Cir.1996); *Amorgianos,* 303 F.3d at 265.

Because his methodology lacks all of these indicia of reliability, the court concludes that it is not the product of a reliable methodology and is thus inadmissible under this step of the analysis.

### C. *Application to the Facts at Hand*

The final requirement of Rule 702 is that the expert witness must be able to assist the trier of fact to reach accurate results. This is the so-called "fit" requirement. *See Daubert,* 113 S.Ct. at 2795–96 (the question of fit is whether the testimony can be applied to the facts at issue); *Paoli,* 35 F.3d at 742–43 (instructing that "fit" is a question of the connection between the scientific research presented and the particular disputed factual issues in the case).

However, because the court has concluded that Dr. Blanchard's testimony and conclusions are unreliable because they are neither grounded on sufficient data nor the product of a reliable methodology, it is unnecessary for the court to determine whether his testimony "fits" the facts at issue. *See Paoli,* 35 F.3d 717, 745 (3d Cir.1994); *Amorgianos,* 303 F.3d at 267.

### CONCLUSION

For the foregoing reasons, the expert testimony of Dr. Blanchard will not be admitted into evidence in this § 2255 petition.